898 P.2d 497

**STATE of Arizona, Appellee,**

v.

**Jason Charles WILLIAMS, Appellant.**

**No. 1 CA–CR 93–0461.**

Court of Appeals of Arizona,
Division 1, Department B.

June 13, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section, and Jack Roberts, Asst. Atty. Gen., Phoenix, for appellee.

M. Ruth O'Neill, Tucson, for appellant.

## OPINION

KLEINSCHMIDT, Presiding Judge.

The Defendant, Jason Charles Williams, appeals his convictions and sentences for armed robbery, kidnapping, burglary and eight counts of sexual assault. He raises many issues on appeal. With one exception, relating to the consecutive sentence for kidnapping, we find no merit to Williams' claims, and we affirm his convictions and sentences.

### FACTS AND PROCEDURAL BACKGROUND

We view the facts in the light most favorable to sustaining the verdicts. *See, e.g., State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). The sixteen-year-old victim testified that on December 17, 1992, she was alone in her parents' home in Eager, Arizona. A man she identified at trial as Williams knocked on her door and asked to use her telephone. Once inside, Williams demanded money and stated, while patting his waist, that he had a gun. The victim said she had $12 in her bedroom. After following her to her bedroom and taking her money, Williams bound the victim's hands with green duct tape. He produced a knife and cut and removed the victim's clothing.

The Defendant then sexually assaulted the victim. First, he forced her to perform fellatio while holding a knife to her head. She bit him, and he removed his penis from her mouth and struck her face with his hand and threatened to kill her. He then forced her to perform fellatio again. A third act of oral sexual contact occurred when Williams placed his mouth on the victim's breasts and vagina. He then inserted his penis into her vagina. He subsequently took the victim to a bathroom where he bent her over a bathroom counter and engaged in anal intercourse. Either before or after this act of anal intercourse, Williams inserted his fingers in the victim's vagina. Next, the Defendant withdrew his penis, had the victim reposition herself facing a different direction, and again engaged in anal intercourse, causing the victim to fall. For the third act of anal intercourse, Williams forced the victim to lie on her back on the bathroom floor. The record does not disclose exactly how long all this took, but it appears from the testimony that there was no lapse of time between the various sexual acts.

When Williams finished his assaults, he told the victim he would kill her if she told anyone what he had done. He then cut the tape from her wrists, crumpled it, and left the house. He apparently took the tape with him since it was not found in the house.

Eventually, a friend of the victim came to the house and called the Eager police. The victim described her assailant as a black male, wearing white overalls and a dark T-shirt. While the police were preparing a "be on the look out" bulletin, they learned that earlier that day a man behaving suspiciously and matching the victim's description of her assailant approached C.G., a resident of the nearby town of St. Johns, and asked to use her telephone. The police were given a description of that man's vehicle—a small, black Mitsubishi with tinted windows, bearing Texas license number GDX 333. In Eager, the victim's neighbor provided police with a similar description of the suspect and his car.

Upon receiving the bulletin, a Catron County, New Mexico, deputy sheriff drove to U.S. Highway 180 which runs from Springerville and Eagar into New Mexico. The deputy saw a vehicle that matched the description in the bulletin. Although one letter of the license number was different from the number described in the bulletin, the deputy stopped the vehicle, saw that the driver,

Williams, matched the description of the suspect, and arrested him. In searching for weapons, the deputy saw a wad of green duct tape on the floor in front of the driver's seat. He also saw a roll of the tape in the car.

An Eagar police officer went to New Mexico to interview Williams. Williams admitted that he had driven through Springerville, St. Johns, and Eagar and that he had been in someone's home in Springerville. He also made statements indicating that he may have stopped at the victim's home. Williams never specifically denied that he raped the victim; he only indicated that he could not recall committing the offenses.

A jury found Williams guilty of armed robbery, kidnapping, first-degree burglary and eight counts of sexual assault. The jury also found all of the offenses to be dangerous. The trial court sentenced Williams to aggravated consecutive sentences on every count except that the burglary and robbery sentence were concurrent.

### THE EVIDENCE OF PRIOR ACTS WAS PROPERLY ADMITTED

The Defendant contends that the trial court improperly admitted evidence of three prior acts which the prosecution claimed the Defendant committed: (1) robbing a motel in Seligman, Arizona; (2) knocking on the door of a residence in St. Johns, Arizona, and asking to use the phone; and (3) asking to use the phone at another residence in Springerville, Arizona. The State asserts that it offered the evidence of these prior acts to prove the Defendant's intent to rob, his motive, his modus operandi, and his identity.

■ The Defendant claims that the evidence of the motel robbery should not have been admitted because it was not relevant since the prosecution did not sufficiently prove that the Defendant committed the robbery and because its probative value did not outweigh its prejudicial effect. He also claims that the instruction the court gave about the motel robbery did not limit the jury to considering the evidence only as to the issues of intent, motive, modus operandi or identity. *See Huddleston v. United*

*States*, 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). As to the evidence of the Defendant's attempts to use the phone at the homes in St. Johns and Springerville, he claims that the evidence was not relevant because the prosecution did not sufficiently prove that it was the Defendant who appeared at those homes. We will discuss each of these prior acts separately.

■ Under Rule 404(b) of the Arizona Rules of Evidence, evidence of other crimes, wrongs, or acts is not admissible to prove a defendant's criminal character. *State v. Fierro*, 166 Ariz. 539, 547, 804 P.2d 72, 80 (1990). Such evidence may be admissible, however, for other proper purposes including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Ariz.R.Evid. 404(b); *State v. Stuard*, 176 Ariz. 589, 597, 863 P.2d 881, 889 (1993). Although the State claims that the evidence of the Seligman robbery was offered to prove intent, motive, and identity, it is clear that as a practical matter, proof of identity was the only legitimate purpose for introducing the evidence.

■ "The identity exception to Ariz. R.Evid. 404(b) applies if identity is in issue, 'and if the behavior of the accused both on the occasion charged and on some other occasion is sufficiently distinctive, then proof that the accused was involved on the other occasion tends to prove his involvement in the crime charged.'" *Stuard*, 176 Ariz. at 597, 863 P.2d at 889 (quoting *Arizona Evidence* § 84, at 183–84). Behavior is sufficiently distinctive in this context if the characteristics of the behavior on each occasion are so unusual and distinctive as to be like a signature. *Id.* "While identity in every particular is not required, there must be similarities between the offenses in those important aspects 'when normally there could be expected to be found differences.'" *State v. Roscoe*, 145 Ariz. 212, 217, 700 P.2d 1312, 1317 (1984), *cert. denied*, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985).

The evidence elicited at the Defendant's trial regarding the Seligman robbery was that about eight or nine hours before the victim in Eager was assaulted, an African–American male, wearing bib overalls, robbed

the Supai Motel in Seligman. Seligman is about 250 miles northwest of Eager. The Seligman victims testified that the robber was armed with a knife, and one of them said that the robber used green duct tape to bind his hands. This victim was cut during a short and unsuccessful attempt to wrest the knife from the robber. Blood found on the Defendant's clothing and on the roll of tape discovered in his vehicle was consistent with this victim's blood.

There were similarities between the robbery in Seligman and the robbery and assault in Eagar. First, both acts were committed by a person wearing bib overalls. Although the description of the color of the overalls was not identical, one of the victims in the Seligman robbery testified that it was dark at the time of the robbery. Second, in each instance, the perpetrator bound the wrists of the victim of the crimes with unusual green duct tape. We find the similarities of a person wearing bib overalls and binding the wrists of his victims with unusual green duct tape to be sufficiently distinctive to indicate that the same person may have committed each of those crimes. The fact that the Defendant robbed a motel in Seligman tends to show that he was driving east across Arizona, augmenting his finances by robbery. This makes it more likely that he is the man who committed the robbery and assault in Eager. The Defendant asserts that the evidence of the Seligman robbery was unduly prejudicial. Prejudicial it no doubt was, but we cannot say that the trial judge abused his discretion in finding the evidentiary value of the evidence on the issue of identity outweighed its prejudicial effect. *See State v. Via*, 146 Ariz. 108, 122, 704 P.2d 238, 252 (1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986) (noting trial court's considerable discretion in deciding whether to admit evidence under Ariz. R.Evid. 403).

■ The Defendant claims, however, that the evidence of the Seligman robbery was not relevant because it was not sufficient to support a finding by the jury that it was the Defendant who committed that robbery. Before evidence of a prior bad act can be admitted, there must be proof that the defen-

dant committed the prior act sufficient to take that case to a jury. *Fierro*, 166 Ariz. at 547, 804 P.2d at 80. While the proof need not rise beyond a reasonable doubt, there must be substantial evidence such that the jury could reasonably conclude that the act occurred and that the defendant was the actor. *Fierro*, 166 Ariz. at 547, 804 P.2d at 80. *See also* Ariz.R.Crim.P. 20 (requiring "substantial evidence" to withstand a motion for judgment before verdict and allow the case to go to the jury); *State v. Pereida*, 170 Ariz. 450, 453, 825 P.2d 975, 978 (App.1992) (citing *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988)) (finding evidence sufficient to take to the jury when the jury could reasonably conclude that the act occurred and that the defendant was the actor).

In this case, there was sufficient evidence that the Defendant committed the Seligman robbery to take that case to a jury. The victims of the Seligman robbery identified the Defendant as the perpetrator from a photographic line-up. While the identification by one of the victims was tentative, the other's was firm and unequivocal. Neither victim was able to positively identify the Defendant at the trial. An expert testified that the green tape used to bind one of the Seligman victim's hands matched the green tape found in the Defendant's car. Furthermore, blood found on the Defendant's clothes and the green tape found in his car was consistent with the blood of one of the Seligman victims. This was sufficient for the jury to reasonably conclude that the Defendant committed the Seligman robbery.

■ Williams argues that the out-of-court identifications made by the Seligman robbery victims should have been excluded because the procedures used in the identification process were too suggestive. The trial court found otherwise. We will not disturb a trial court's findings on identification issues absent a showing of clear and manifest error. *State v. Fierro*, 166 Ariz. 539, 545, 804 P.2d 72, 78 (1990).

The threshold issue is whether the identification procedure " 'created a substantial likelihood of irreparable misidentification.' " *Id.* Williams cites to a portion of the record in

which the trial court stated there were "too many differences" between his and the other subjects' photographs. The State contends that this quote reflects a typographical error and should have read: "two main differences." The State's position makes sense because the trial court went on to enumerate two differences: the word "many," if that was the word intended, is misspelled; and the trial court ultimately found the line-up not to be unduly suggestive. We note too, that there are many other transcription errors in the record. We need not mire ourselves in the issue of the record's accuracy. We will accept the Defendant's contention that it is accurate.

The trial court mentioned two differences between Williams' photograph and those of the other subjects. We have reviewed the photographs, and we, too, note the two differences: there are the placard chains around the necks of all the subjects except Williams, and there are lines in the background behind Williams' photograph. Williams complains that his photograph is slightly blurry as well. We agree with the trial judge that although the differences do exist, they are not particularly significant and are not unduly suggestive.

 Finally, in this regard, the Defendant claims that the trial court erred by not giving the jury a proper limiting instruction regarding this prior act evidence. The record reveals, however, that after a sheriff's deputy testified regarding the Seligman robbery, the court stated to the jury, "You must not consider this evidence to conclude that the individual has a bad character and is more likely to have committed the crime charged in this case." The Defendant argues that this instruction was improper because it did not refer to the purposes for which the evidence could be considered, but referred only to the improper purpose. We acknowledge that this admonition was incomplete, but the record also shows that the parties agreed to the following instruction which was to be given at the close of all the evidence:

Evidence regarding incident occurring in Seligman was admitted because it may be related to issues involving identity or intent or plan. You must not consider this evidence to conclude that the individual has a bad character or is more likely to have committed the crimes charged in this case.

This instruction was given to the jury in writing. We assume that it was read to the jury because the record shows that the prosecutor and the defense attorney agreed to waive recordation of the reading of each instruction. The record indicates that "the Judge read the jury instructions." Defense counsel neither objected to the instruction nor informed the judge that any instruction on this point was omitted or unimportant.

This latter instruction is more generous to the Defendant than required because it can be read to mean that the jury should not have considered the evidence of the Seligman robbery as proof that the Defendant committed the crimes for which he was on trial. That, of course, is the very reason the evidence of the Seligman robbery was admitted. The instruction should have read: "You must not consider the evidence to conclude that the individual has a bad character and is therefore more likely to have committed the crime for which he is on trial in this case." Since the instruction as it was actually given was more favorable to the Defendant than necessary, there is no cause to reverse.

 We turn to the Defendant's arguments regarding the evidence of his other activities earlier in the day in question. The State presented evidence that on the same day the victim was assaulted, the Defendant knocked on the doors of homes in St. Johns and Springerville and asked to use the phone. St. Johns is about thirty miles from Springerville. Eager is adjacent to Springerville.

Generally, "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Ariz.R.Evid. 401. Here, because the person who committed the robbery and assaults had knocked on the victim's door and asked to use the phone, the evidence that the Defendant did the same on two other occasions on the same day in two nearby towns makes it

more probable that the Defendant was the person who committed the crimes for which he was on trial. In other words, the evidence suggests a modus operandi that links the Defendant to the crime for which he was on trial.

The Defendant argues, however, that the evidence of what happened in Springerville was not relevant because it was insufficient to establish that it was the Defendant who asked to use the phone on that occasion. He bases his argument on the fact that none of the three witnesses to this incident could identify the Defendant as the person who appeared at the home in Springerville. The description of the man who asked to use the phone was similar to the victim's and others' descriptions of the Defendant, the man's car was similar to the Defendant's car, and his clothes were similar to the Defendant's clothes. Furthermore, the Defendant told the police that he had gone to a two-story home in Springerville where he saw a woman and three or four little girls and noticed a white car and van in front of the home. This was consistent with other testimony concerning this incident. Accordingly, there was substantial evidence upon which the jury could reasonably conclude that the Defendant was the person who asked to use the phone at the home in Springerville. Thus, the trial judge did not abuse his discretion in allowing the prosecution to present this evidence.

### THERE WAS NO ERROR IN THE SELECTION OF THE JURY

■■■ Williams claims the trial court erred by allowing the prosecutor to exercise peremptory challenges against the Native Americans who were on the panel from which the jury was selected. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court enunciated a three-step procedure for challenging a peremptory strike that is believed to have been racially motivated: (1) the opponent of a strike must present a *prima facie* case that the strike is racially motivated; (2) the proponent then must articulate a race-neutral reason for the strike; and (3) the trial judge must determine whether the defendant has

proven that the strike was based on race. *Id.* at 86, 106 S.Ct. at 1717. The trial judge's findings on the third step are findings of fact which, on review, "will be reversed only if clearly erroneous." *State v. Cruz*, 175 Ariz. 395, 398, 857 P.2d 1249, 1252 (1993). The trial judge's findings necessarily turn on issues of credibility to which this court defers. *State v. Hernandez*, 170 Ariz. 301, 304, 823 P.2d 1309, 1312 (App.1991); *State v. Medina*, 172 Ariz. 287, 290, 836 P.2d 997, 1000 (App. 1992).

During voir dire, the prosecution exercised peremptory strikes against Native–American members of the venire J.H. and L.N. Williams challenged the strikes on the ground that they were racially motivated. The prosecutor denied any racial motivation. He explained that he struck J.H. because J.H. was single, had a child and possibly had never been married. The prosecutor believed this raised an issue about J.H.'s moral values which might, in J.H.'s mind, diminish the seriousness of the charges against Williams.

The prosecutor explained that he struck L.N. because she knew six other venire members and might be overly influenced by them. He also indicated that L.N. had a relative "who was convicted of a criminal offense" and other relatives who "had been involved in similar cases or experiences of a sexual nature."

The prosecutor's reasons were facially race neutral and case related. *See State v. Tubbs*, 155 Ariz. 533, 537, 747 P.2d 1232, 1236 (App. 1987). However, one factor to consider in analyzing whether discrimination has occurred is whether the prosecutor exercises peremptory challenges consistently. Here, the prosecutor excused L.N. because, among other reasons, she knew other members of the venire. But venireperson V.B. also knew six venirepersons, and another, M.C., knew "all" of them, and yet, the prosecutor did not strike them. On the other hand, venirepersons J.G., M.Y. and S.J. described experiences with the legal system similar to L.N.'s son's experience. J.G. had been convicted of possession of dangerous drugs in New York. M.Y.'s husband was "involved" in a sexual assault, and S.J.'s cousin "went to prison" for

sexual assault. The court excused M.Y. and S.J. for cause, and the prosecutor peremptorily struck J.G. Thus, the prosecutor used his peremptory strikes consistently on the issue of the venirepersons' personal experiences, including L.N.'s experience, with the legal system. Furthermore, there is no indication in the record that the prosecutor failed to strike venirepersons with a background similar to the one the prosecutor relied on to strike J.H. We observe, too, that five venirepersons of Native–American descent were left on the panel by the prosecution. Thus, the prosecutor was largely, if not totally, consistent in the use of peremptory challenges.

We disagree with Williams' assertion that the prosecutor's professed reasons for the strikes were "purely subjective" and therefore deserving of greater scrutiny. Williams' reliance on *State v. Cruz* is misplaced. In *Cruz*, the prosecutor explained that he struck an Hispanic juror because she was "weak, [had] poor contact with [the prosecutor], [and because the prosecutor] felt she would be led." 175 Ariz. at 399, 857 P.2d at 1253. The prosecutor could not provide the trial court with any objective support for his impressions. *Id.* Under those circumstances, the supreme court held that objective criteria were required to support the trial court's decision not to reinstate the venireperson. *Id.* at 399–400, 857 P.2d at 1253–54.

Conversely, this prosecutor's reasons were based on articulated objective criteria—the venirepersons' backgrounds and relationships—not on the prosecutor's inscrutable feelings. Williams' arguments about the soundness of the prosecution's strategy in striking J.H. and L.N. misses the point. A peremptory strike need not be totally logical or strategically sound; the motivation for it need only be race neutral. Of course, the fact that a tactic is unsound may bear upon the question of the prosecutor's credibility. Here, the trial court expressly found the prosecutor credible. We will not second-guess the trial judge's assessment of the prosecutor's credibility based on the Defendant's speculation about the prosecutor's true motive. *See Hernandez*, 170 Ariz. at 304, 823 P.2d at 1312. When every factor bearing

on the question is weighed, we cannot say the trial judge abused his discretion in upholding the challenges.

### THE COURT DID NOT ERR IN ALLOWING THE VICTIM TO IDENTIFY THE DEFENDANT IN COURT

 Williams claims the victim's in-court identification of him as her assailant should have been suppressed as unduly suggestive because the victim had not identified him before trial and the in-court identification occurred five months after the crime. We consider five factors in determining whether an identification procedure renders the identification unreliable: (1) the witness' opportunity to observe the suspect during the event; (2) the witness' degree of attention at that time; (3) the accuracy of the witness' prior description of the suspect; (4) the degree of certainty expressed by the witness; (5) the time between the event and the identification procedure. *Neil v. Biggers*, 409 U.S. 188, 200–201, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972).

The first two factors require no discussion as they clearly militate in favor of validating the identification. Without elaboration, Williams contends the victim's prior description was not accurate, the focus of the third factor. The record undermines Williams' assertion. The victim described her attacker to police as a young, short-haired, African–American male who wore white bib overalls and a dark t-shirt. That is precisely how he appeared when police apprehended him in New Mexico. It is true that the height and weight elements of the victim's description were inaccurate. The victim described her attacker as being five feet six inches tall and weighing 160 pounds. An officer said he was closer to six feet tall and 200 pounds. The discrepancy in these two different estimates by two different people does not vitiate the overall accuracy of the description.

The victim's degree of certainty in identifying Williams, the fourth factor, also supports allowing the in-court identification. The record reveals no hesitancy or equivocation in her identification. With respect to the final factor—time—we conclude that the passage of five months between the crime and the

identification does not invalidate the identification.

## THE DEFENDANT'S POST-ARREST STATEMENTS WERE ADMISSIBLE

 After Williams was given the *Miranda*[1] warnings and indicated that he understood his rights, and after a lengthy interrogation by the Eager police officer, Williams stated, "I'm already arrested, so this is not my statement, is it?" Williams asserts that this question demonstrates that he did not understand his rights and therefore could not have knowingly and intelligently waived them prior to that point. The trial court ruled that the totality of the circumstances indicate that Williams' waiver of his rights was knowing and intelligent. We will not disturb a trial court's ruling on the admissibility of a confession absent clear and manifest error. *State v. Lopez*, 174 Ariz. 131, 137, 847 P.2d 1078, 1084 (1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). No such error occurred. Williams had been given *Miranda* warnings three times before he was interviewed by the officer from Eager. The police who interacted with him indicated that he was alert and responsive. He told the officers that he understood his rights and he knew he was a suspect in a sexual assault investigation. He eventually made an unequivocal request for counsel, indicating he was aware of his right to do so earlier. The trial court did not err in admitting the statements.

## THE ITEMS SEIZED FROM WILLIAMS' CAR WERE PROPERLY ADMITTED IN EVIDENCE

 Williams asserts that the search of his car was unlawful because the deputy who stopped him lacked probable cause to arrest him. He further asserts that the unlawful arrest rendered his written consent for the subsequent searches ineffective.

Both of Williams' challenges to the search hinge on whether his arrest by the deputy sheriff in New Mexico was lawful. The search was lawful because it was supported by probable cause. The deputy received information that a crime had been committed by a young, short-haired, African–American male wearing white bib overalls and a dark blue T-shirt, who was driving a Mitsubishi with a Texas license plate number. The officer stopped a car traveling away from Arizona that matched the description of the suspect's car, except that one number of the license plate was different. When the driver got out of the car, the officer observed that he matched the physical description of the suspect, other than the height and weight. The variation in Williams' actual height and weight compared to the height and weight indicated in the bulletin did not negate probable cause.

Williams verbally consented to the initial search and if that were not enough, which it was, he signed a written waiver as to the subsequent searches. The police explained his right to withhold consent. The mere fact that his vehicle had been searched once did not somehow vitiate the voluntariness of his consent to further searches.

Williams asserts that the bulletin improperly combined the information from the victim with the information provided by one of the women who was asked by Williams to use her telephone and with information supplied by that woman's neighbor. He articulates no logic, nor offers any authority to support his point. The information was properly combined. *Cf. State v. Richards*, 110 Ariz. 290, 292, 518 P.2d 113, 115 (1974); *State v. Lawson*, 144 Ariz. 547, 553, 698 P.2d 1266, 1272 (1985) (an arresting officer need not be in personal possession of all facts as long as probable cause exists from the collective knowledge of all law enforcement agents involved in the operation).

## THE PROSECUTOR DID NOT COMMIT MISCONDUCT IN REFERRING TO THE DEFENDANT'S RACE

 We are next asked to consider whether the prosecutor's references to Williams' race constituted fundamental error. Williams is an African–American. While talking about the identification issues, the

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

prosecutor, without objection from the defense, stated during final argument:

And there is another factor which is kind of an obvious factor, it's a unique factor in this area which is that Mr. Williams is black. That's not a reason alone to find him guilty, but him being a black in Eagar, Arizona, with white bib overalls and blue shirt is something you should take into consideration on December 17, 1992, because he's saying it wasn't him and so there must be [sic] have another, not just another man, but another black man in Eagar, Arizona, on December 17, 1992 wearing white bib overalls and having a blue shirt.

The prosecutor also stated:

I don't know, the man's underwear. She didn't even mention that. Gee, I wonder what her explanation was for that is? [The victim] was just a good guesser or another black man with blue underwear just happened to be walking around that day.

He further stated:

Mrs. Comvalius isn't hired by the Eagar Police Department. She works for the hospital. What was her motive for intentionally throwing away swabs assuming that she did do that thing intentionally? What was her motive? Gee, maybe she heard it was a black man and she wanted help [sic] him get off.

Williams points out that the prosecutor made additional passing references during his opening statement and closing argument regarding his ethnicity.

■ Fundamental error is error that deprives a defendant of a fair trial, that goes to the foundation of the case or deprives a defendant of a right essential to the defense. *E.g., State v. Gendron,* 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991). In this connection, we consider whether the prosecutor's remarks drew the attention of the jurors to matters "they would not be justified in considering" and whether the remarks influenced the jury. *State v. Hansen,* 156 Ariz. 291, 296–97, 751 P.2d 951, 956–57 (1988). The prosecutor's first two remarks taken in context, focused on appropriate matters dealing with identification issues. They were not an appeal to

racial prejudice. These comments did not create error, much less fundamental error. The prosecutor's remark about the hospital employee, if inappropriate, was obviously factitious and did not inject the issue of race into the trial in a way that prejudiced the Defendant.

## WITH ONE EXCEPTION, NO ERROR OCCURRED AT SENTENCING

### The Court Properly Found and Applied Aggravating Circumstances

■ We reject Williams' argument that the trial court used improper factors to aggravate his sentences. The standard of review on this issue is abuse of discretion. *E.g., State v. Jones,* 147 Ariz. 353, 355, 710 P.2d 463, 465 (1985).

The trial judge stated that he considered the following factors in aggravating Williams' sentence:

1. threatened infliction of serious physical injury;

2. use of a deadly weapon;

3. the seriousness of the emotional and physical harm to the victim;

4. the crime was "especially heinous, cruel or deprived";

5. committing the crime with expectation of pecuniary gain;

6. the Seligman robbery.

Williams contends the three latter factors were improper considerations. We disagree.

Williams asserts that the trial court erred by treating all of the offenses together in applying the aggravating circumstances. By combining the factors he considered, the Defendant contends, the trial judge erroneously found that the fifth factor, pecuniary gain, applied to the sexual assault counts. The better practice is to discuss aggravating and mitigating factors for each count separately. *State v. Wideman,* 165 Ariz. 364, 369–70, 798 P.2d 1373, 1378–79 (App.1990). However, that is not an absolute requirement. We doubt that the trial judge used the pecuniary gain to aggravate the sentences for sexual assault. Assuming that he did, a trial court may properly use aggravating circumstances from other offenses committed as part of "a

continuing transaction." *Id.* at 370, 798 P.2d at 1379. Even if the judge used pecuniary gain as an aggravating factor when he should not have, in view of the enormity of the sexual offenses, we are satisfied that the trial judge, without considering pecuniary gain as an aggravating factor, would have imposed the same sentences for the sexual assaults. *See State v. Ojeda,* 159 Ariz. 560, 562, 769 P.2d 1006, 1008 (1989) (no remand necessary where record clearly shows that sentence would have been the same even without consideration of improper factors).

 Williams claims that the factual basis of the court's finding that the crime was especially cruel, heinous or depraved also improperly formed the factual basis for finding the aggravating factor of emotional and physical harm to the victim. The judge stated that Williams' use of a knife to cut off the victim's clothes, his striking the victim and the victim's virginity demonstrated that the crime was committed in an especially cruel and heinous manner. The use of a knife and striking the victim also were employed to support the finding that the crime was dangerous. Therefore, according to Williams, the trial court "double count[ed]" those facts. First, a court can properly use a single fact to support application of more than one aggravating factor. *Cf. State v. Bly,* 127 Ariz. 370, 372–73, 621 P.2d 279, 281–82 (1980) (weapon properly used to elevate seriousness of the offense, to enhance the sentence for dangerousness and to aggravate a sentence). Second, the trial judge articulated other independent bases for finding serious physical and emotional harm to the victim. The judge cited in support of that aggravating factor the violation of the victim's trusting innocence, the victim's serious anal injury and Williams' threats to kill her. Thus, aggravation for the seriousness of the victim's injuries is supported even without resort to the challenged factual bases.

Williams contends the sixth factor the judge used in aggravating the sentence, the commission of the Seligman robbery, was inadequately proven, and should not have applied to any of his offenses. For the reasons already set forth in this decision, we disagree.

### The Court, With One Exception, Properly Imposed Consecutive Sentences for Robbery, Kidnapping, and Assault

The trial judge sentenced the Defendant to twelve years in prison for each of the eight counts of sexual assault. He ordered each of these sentences to run consecutively to the one which preceded it. He also sentenced the Defendant to twelve years in prison on the kidnapping count and the counts for armed robbery and first-degree burglary. The kidnapping sentence was also to be served consecutively to the sentences for sexual assault. The judge ordered the armed robbery and first-degree burglary sentences to run concurrently, but consecutively to the kidnapping sentence and the sentences for the sexual assaults.

The trial judge stated at the sentencing hearing that if his memory was wrong concerning the testimony of the victim regarding when the Defendant first displayed the knife, then he would have made the kidnapping sentence concurrent with the armed robbery and first-degree burglary sentences, but still consecutive to the sexual assault sentences. The trial judge thought that the Defendant first displayed the knife before he took the victim to her bedroom. We have reviewed the record, however, and find that the victim testified that the knife was not displayed until she and the Defendant were in her bedroom. Because the trial judge said that he would have made the kidnapping sentence concurrent with the armed robbery and burglary sentences if that were the case, we amend the kidnapping sentence to run concurrently with the armed robbery and burglary sentences. Remanding for this purpose is not necessary. A.R.S. § 13–4037.

 The Defendant contends that none of his sentences should have been imposed consecutively. He asserts that all of his crimes arose out of a single act which requires the sentences for those crimes to be imposed concurrently pursuant to A.R.S. section 13–116. That statute provides:

An act or omission which is made punishable in different ways by different sections of the laws may be punished under both,

but in no event may sentences be other than concurrent.

■ Consecutive sentences are presumed appropriate. A.R.S. § 13–708. However, because A.R.S. section 13–116 mandates concurrent sentences for crimes arising out of a single act, the issue is whether any of the Defendant's acts which constituted the sexual assaults was the same act which constituted either armed robbery, burglary or kidnapping. *See State v. Gordon*, 161 Ariz. 308, 312, 778 P.2d 1204, 1208 (1989). In other words, we must determine whether any of the charges of sexual assault, the armed robbery, the burglary or the kidnapping constituted a single act.

A three-part test, originally set forth in *Gordon* is applied to determine whether A.R.S. section 13–116 precludes double punishment. *State v. Runningeagle*, 176 Ariz. 59, 67, 859 P.2d 169, 177 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993). As we explained in *State v. Alexander*, 175 Ariz. 535, 537, 858 P.2d 680, 682 (App.1993), the test applies as follows:

> [T]he first step in the analysis is to determine which crime arising out of the incident is the "ultimate crime." The "ultimate crime" is the crime which has a factual nexus to all the other crimes. The ultimate crime will usually be the primary object of the episode, and it will usually be the most serious crime committed on a given occasion. Once the ultimate crime is determined, the test to be applied is as follows. If, considering all the facts of the incident and subtracting the facts necessary to convict of the ultimate crime, the remaining facts satisfy the elements of the other crime(s), then multiple punishments *may* be permissible. Assuming that this first step is satisfied, multiple punishments are ordinarily permissible only if (1) given the entire criminal episode, the defendant could have committed the ultimate crime without committing the other crime(s) or (2) in committing the other crime(s), the

defendant caused the victim to suffer additional risk or harm beyond that inherent in the ultimate crime.

Applying the test to this case, we must first determine which crime was the ultimate crime. While it is difficult to say which of the crimes was the ultimate crime in this case,[2] we will presume, for the sake of analyzing whether the kidnapping, burglary and robbery sentences can be consecutive to the sexual assaults, that the sexual assaults, collectively, are the ultimate crime.

All of the sexual assaults were committed by the Defendant penetrating the victim's mouth, vagina, or anus with his penis or his finger or by placing his mouth on the victim's breasts and vagina. Subtracting these facts from the episode leaves the facts that the Defendant entered and remained in the victim's home with the intent to commit a serious crime, robbed the victim while threatening to use a gun, forced the victim down the hall to her bedroom where he forcibly took money from her, and bound her wrists with green duct tape.

If all the facts which establish the sexual assaults are subtracted, the remaining facts that the Defendant took money from the victim and threatened to use a gun are sufficient to establish the crime of armed robbery. *See* A.R.S. § 13–1902(A); 13–1904(A)(2). The Defendant could have committed the sexual assaults without committing the armed robbery, and the robbery exposed the victim to harm in addition to the harm from the sexual assaults. A sentence for robbery which is consecutive to the sexual assaults was, therefore, appropriate.

■ As to whether the sentence for kidnapping can be consecutive to the sentence for sexual assaults, kidnapping is the restraint of another person with the intent to inflict a sexual offense on the victim, or to otherwise aid in the commission of a felony. A.R.S. § 13–1304(A)(3). After subtracting the facts relating to the sexual assaults, the remaining facts are sufficient to establish kidnapping, i.e., the Defendant grabbed the

2. Division Two of this court has recognized that in the case of a single episode involving several sexual crimes *Gordon* is difficult, if not impossible to apply. *See State v. Boldrey,* 176 Ariz. 378,

382 n. 3, 861 P.2d 663, 667 n. 3 (App.1993) (involving multiple sexual acts with a child); *State v. Arnoldi,* 176 Ariz. 236, 240, 860 P.2d 503, 507 (App.1993) (same).

victim, forced her down the hall, bound her with green duct tape, and held her down before committing the sexual assaults. Because the Defendant could not have committed the sexual assault without restraining the victim's movement, consecutive sentences may be permissible only if the kidnapping added to the victim's risk of harm. *Alexander,* 175 Ariz. at 537, 858 P.2d at 682. In *Gordon,* the fact that the defendant held the victim on the floor, hit her with his fists, and strangled her was sufficient in this respect to justify a consecutive sentence for kidnapping. 161 Ariz. at 316, 778 P.2d at 1212. Here, too, the Defendant went beyond the restraint necessarily inherent in the sexual assault— he forced the victim through her house on two occasions, bound her wrists with green duct tape, and reinforced the restraint by hitting her in the face. A consecutive sentence for kidnapping was appropriate. *See id.*

Finally, we consider whether the sentence for burglary can be consecutive to the sentences for sexual assault. Burglary is committed, among other things, when a person enters or remains in a residence with the intent to commit a theft or any felony therein. A.R.S. § 13–1507. After subtracting the facts necessary to establish the sexual assaults, there remains the fact that the Defendant entered and remained in the victim's home for the purpose of robbing her and/or committing sexual assaults. Thus, a consecutive sentence for the burglary was permissible so long as the Defendant could have committed the sexual assaults without also committing the burglary or so long as the burglary exposed the victim to additional risk of harm beyond that inherent in the sexual assaults.

At first glance, it does not appear that the Defendant could have committed the sexual assaults without committing the burglary because he had to enter and remain in the victim's home with the intent to commit the sexual assaults in order to commit the sexual assaults. It appears, however, that *Runningeagle* expanded and possibly modified the original *Gordon* analysis.

In *Gordon,* the defendant sexually assaulted the victim in her home. 161 Ariz. at 309,

778 P.2d at 1205. The supreme court held that the sentence for burglary could not be consecutive to the sentence for kidnapping and sexual assault because the sexual assault could not have taken place without the burglary and the burglary did not expose the victim to any additional harm. *Id.* at 315, 778 P.2d at 1211. The court in *Gordon* had no occasion to consider whether the burglary sentence could have been consecutive to the sexual assault if some felony not related to the sexual assault had also been committed in the victim's house. In *Runningeagle,* the defendant, who had been seen pilfering an automobile, followed the witness into the witness' house, killed him and stole some property. 176 Ariz. at 61–62, 859 P.2d at 171–72. The court reasoned, without restricting its comparison of the burglary to the ultimate crime of murder as the literal application of *Gordon* seems to require, that since one object of the entering or remaining in the house was the theft, and the burglary was charged as entering and remaining in the house with the intent to commit the *theft,* the defendant could have committed the murder without committing the burglary (i.e., theft), so a consecutive sentence was permissible. *Id.* at 67, 859 P.2d at 177.

Applying the *Gordon* analysis consistent with its application in *Runningeagle,* it was possible for the Defendant in this case to commit the sexual assaults without also committing the burglary (its object being armed robbery). *See Runningeagle,* 176 Ariz. at 67, 859 P.2d at 177. While we note that the information in this case did not specify whether the Defendant entered the victim's home with intent to commit the armed robbery or the sexual assaults, the felony element required to commit the burglary could have been satisfied by the armed robbery rather than the sexual assault. Under the facts of this case, the Defendant would have committed burglary even if he had not committed the sexual assaults.

Further, the burglary (its object being armed robbery) caused the victim to suffer an additional risk: a risk to her property and the sanctity of her home as opposed to a risk to her person. *See id.* Thus, it was appropriate for the court to order the sentence for

the burglary to be consecutive to the sentences for the sexual assaults.

## EACH SENTENCE FOR SEXUAL ASSAULT MAY BE CONSECUTIVE TO THE OTHERS

■ The Defendant was convicted on two counts of fellatio, one count of cunnilingus, one count of vaginal intercourse, one count of digital intercourse, and three counts of anal intercourse. The question here is whether it was proper for the trial court to order consecutive sentences for each of the different types of sexual assault and whether it was proper to order consecutive sentences for each of the two counts of fellatio and each of the three counts of anal intercourse.

With respect to the different *types* of acts, the question is tested under the *Gordon* analysis—whether any of the acts which constituted one of the sexual assaults was the same act which constituted one of the other sexual assaults. If so, then the sentences for those sexual assaults cannot be consecutive. *See State v. Arnoldi*, 176 Ariz. 236, 240–41, 860 P.2d 503, 507–08 (App.1993); *State v. Boldrey*, 176 Ariz. 378, 382–83, 861 P.2d 663, 667–68 (App.1993).

Under the first prong of the *Gordon* analysis, it is clear that the elements of fellatio, cunnilingus, vaginal intercourse, digital intercourse and anal intercourse are different since each act is factually distinct from the other. *See State v. Griffin*, 148 Ariz. 82, 86, 713 P.2d 283, 287 (1986). Thus, consecutive sentences were permissible so long as it was not factually impossible for the Defendant to commit one of the sexual assaults without also committing one of the others or the different types of assaults exposed the victim to a different harm or risk of harm. Here, it is obvious that the Defendant could have committed each of the different assaults without committing the others. Further, each different act exposed the victim to a different type of harm. Thus the trial court did not err in ordering consecutive sentences for the different types of sexual assaults. *See Boldrey*, 176 Ariz. at 382–83, 861 P.2d at 667–68.

■ We next consider whether it was proper to impose consecutive sentences for the two acts of fellatio and three acts of anal intercourse. The question arises because the multiple assaults of the same type occurred in very rapid succession during a single episode. For example, the acts of anal intercourse were interrupted only to change positions. The question here is different from the question which gives rise to a *Gordon* analysis because it does not involve whether the Defendant was convicted for the same act under different provisions of the law, but whether the Defendant violated the same statute or committed the same crime multiple times. Thus, A.R.S. section 13–116 is not applicable to this issue. *See State v. Henley*, 141 Ariz. 465, 467–68, 687 P.2d 1220, 1222–23 (1984); *State v. Hamblin*, 165 Ariz. 211, 213–14, 797 P.2d 1229, 1231–32 (App.1990).

So long as the multiple acts of fellatio and intercourse can be considered *separate* offenses, nothing prohibits consecutive sentences for those convictions. To the contrary, A.R.S. section 13–708 presumes consecutive sentences are appropriate.

There is no Arizona case which deals with assaults of the same type that occur in very rapid succession. A few Arizona cases, however, are sufficiently similar to this one to shed some light on the question. In *State v. Hill*, 104 Ariz. 238, 450 P.2d 696 (1969), the defendant broke into a house where he compelled a woman to engage in acts of cunnilingus, fellatio and four separate acts of sexual intercourse. These acts took place in the span of one and a half hours, and the defendant never left the victim's bed. *Id.* at 238, 450 P.2d at 696. In holding that the defendant could be charged with two counts of sexual intercourse and two counts of lewd and lascivious acts, the supreme court stated:

> When several acts of intercourse and several lewd and lascivious acts are committed on the same victim we see no reason why as many counts for each offense cannot be brought, despite the fact the defendant never left his victim's bed during the course of the commission of the acts.

*Id.* at 240, 450 P.2d at 698.

In *State v. Bruni*, 129 Ariz. 312, 315, 630 P.2d 1044, 1047 (App.1981), the defendant

was convicted of, among other things, two counts of attempted sexual intercourse and two counts of sexual intercourse on one victim, and two counts of sexual intercourse on another victim. The only facts given in the opinion indicate that the acts committed on the first victim occurred within two hours, and the two acts of intercourse committed on the second victim occurred within a span of four hours. *Id.* at 318, 630 P.2d at 1050. The court held that so long as the evidence supports the commission of each of the separate charges, they are separate acts and not multiplicious. *Id.* at 320, 630 P.2d at 1052. The court also indicated that it is against public policy to allow a person to repeat the crime of rape as many times as he likes on the same victim with no additional criminal liability for the subsequent rapes. *Id.*

In *State v. McCuin*, 167 Ariz. 447, 449, 808 P.2d 332, 334 (App.1991), *vacated in part on other grounds*, 171 Ariz. 171, 829 P.2d 1217 (1992), in dealing with multiple sexual assaults, each of a different type, the court stated, "[i]f the state can prove the necessary criminal elements of each act, the time span within which the acts were committed is immaterial." Because the court in *McCuin* was not dealing with multiple acts of the same type, the case cannot be said to definitively hold that the brevity of the time between identical acts is immaterial.

We have examined cases from other jurisdictions which bear on this point. In *People v. Harrison*, 48 Cal.3d 321, 256 Cal.Rptr. 401, 405, 768 P.2d 1078, 1082 (1989), in which the defendant's digital penetration of the victim was briefly interrupted by her resistance, the Supreme Court of California held that each time a new and separate penetration occurred, a new and separate violation of California's sexual assault statute was completed, since all the elements of the three completed violations were present. In *People v. Marks*, 184 Cal.App.3d 458, 229 Cal.Rptr. 107, 111 (1986), which is very similar to the case we decide, the defendant shoved his victim's head into a closet, lifted up her bathrobe and penetrated her anally for a "long time." The defendant then withdrew, forced his victim across the room, and penetrated her anus again. *Id.* The court held that the defen-

dant committed two offenses, each of which was punishable separately, even though the two penetrations occurred within a short time of one another. *Id.* 229 Cal.Rptr. at 111–12. The court said, "Defendant, who caused his victim to undergo two separate humiliating and painful violations of her body, was more culpable in committing the two acts of sodomy than if he had committed only one." *Id.* at 112; *see also People v. Mixon*, 225 Cal.App.3d 1471, 275 Cal.Rptr. 817, 825–26 (1990) (finding that vaginal penetration while victim was on her back and then turning victim over and vaginally penetrating her from the rear were two separate acts so that the defendant could be convicted of two counts of rape).

Other states also allow multiple convictions and punishments for multiple sexual acts that occur during one episode, but require the court to consider a number of factors in making that determination. Under some of these tests, it is possible that the Defendant in the case before us could not be convicted of, or receive consecutive sentences for, each of the different acts engaged in here. *E.g., Herron v. State*, 111 N.M. 357, 361, 805 P.2d 624, 628 (1991) (considering (1) time lapse between penetrations; (2) location of the victim during each penetration; (3) existence of intervening event; (4) sequence of penetrations; (5) defendant's intent as evidenced by his conduct and utterances; and (6) number of victims); *State v. Hamilton*, 791 S.W.2d 789, 795 (Mo.Ct.App.1990), *cert. denied*, —— U.S. ——, 115 S.Ct. 741, 130 L.Ed.2d 643 (1995) (considering (1) time; (2) place; and (3) the defendant's intent); *Harrell v. State*, 88 Wis.2d 546, 277 N.W.2d 462, 472–73 (Ct.App.1979) (considering (1) nature of the act; (2) time; (3) place; (4) intent; (5) cumulative punishment; (6) muscular contraction; and (7) number of victims). We also note that other states do not allow multiple convictions for multiple sexual acts committed during one episode. *See State v. Dorsey*, 224 Kan. 152, 578 P.2d 261, 265 (1978); *State v. Andrews*, 707 P.2d 900, 909 (Alaska Ct.App.1985), *aff'd*, 723 P.2d 85 (Alaska 1986). Nonetheless, based on the Arizona decisions which touch on the point, and the California cases which are directly applicable,

we believe each act constituted a separate crime which can be punished consecutively.

We have reviewed the record for fundamental error, and we have found none. The convictions and sentences are affirmed, except that the sentence for kidnapping is amended to run concurrent with the sentences for robbery and burglary.

VOSS, J., and J. THOMAS BROOKS,* J., Retired, concur.

---

* The Honorable J. Thomas Brooks, Retired, was authorized to participate in this appeal by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. VI, § 20 and Ariz.Rev. Stat.Ann. § 38–813.