NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

CHRISTOPHER HENDERSON, *Appellant*.

No. 1 CA-CR 11-0389
FILED 12-30-14

Appeal from the Superior Court in Maricopa County
No.  CR2009-132172-001DT
The Honorable Susanna C. Pineda, Judge

**REVERSED AND REMANDED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Alice Jones
*Counsel for Appellee*

Gail Gianasi Natale, Attorney at Law, Phoenix
By Gail Gianasi Natale
*Counsel for Appellant*

## MEMORANDUM DECISION

Presiding Judge Peter B. Swann delivered the decision of the Court, in which Judge Kenton D. Jones and Judge Michael J. Brown joined.

**S W A N N**, Judge:

**¶1** Christopher Henderson appeals his convictions for two counts of sexual assault. We now vacate those convictions and remand for a new trial. We hold that the trial court abused its discretion when it admitted "other-act evidence" inconsistent with Ariz. R. Evid. 404(b).

## FACTS AND PROCEDURAL HISTORY

**¶2** The state charged Henderson with committing multiple sexual offenses against two victims in April and May of 2009. The trial court severed the cases and tried each victim's case separately. In the first trial, the jury acquitted Henderson of three of the four charges, and the trial court dismissed the remaining charge after the jury was unable to reach a verdict. In the second trial, the jury convicted Henderson of two counts of sexual assault but acquitted him of sexual abuse, attempted sexual assault and kidnapping. The jury was presented with evidence of the following facts.

**¶3** The victim's attacker approached the victim as she stood at a bus stop and told her that he was from out of town and needed directions.[1] He claimed he had a device in his car that the victim could use to show him directions, and the victim followed him to the car. When they arrived, he asked the victim for a "hand job." The victim declined and said she had to leave. He then grabbed the victim, told her he would not hurt her if she cooperated, and ordered her into the car.

**¶4** The attacker drove the victim to a different location. He began to touch the victim's legs and breasts. As he did so, he told her he was not a police officer. A detective testified that this was significant because it suggested the attacker believed the victim was a prostitute and that he was familiar with methods prostitutes and their solicitors use to prove they are not undercover officers. To identify Henderson as the attacker, the state introduced evidence that

---

[1] We view the evidence in the light most favorable to sustaining the convictions and resolve all reasonable inferences against the defendant. *State v. Karr*, 221 Ariz. 319, 320, ¶ 2, 212 P.3d 11, 12 (App. 2008).

Henderson had solicited the services of a prostitute on one occasion more than a year before the date of the incident.

¶5         After he told the victim he was not an officer, the attacker ordered the victim into the back seat and told her to pull down her pants. When she resisted, he choked her. The victim eventually pulled down one of her pant legs and the attacker digitally penetrated her. The attacker then ordered the victim to turn around so he could engage in anal sex with her. When she resisted, he shoved her down and digitally penetrated her a second time. The trial court allowed the state to introduce evidence of what it alleged to be Henderson's interest in anal sex in an attempt to identify him as the attacker. However, the only evidence on this point was from Henderson himself, who testified he had no particular interest in anal sex, although he would be willing to engage in it.

¶6         The state collected multiple samples of physical evidence, including large portions of upholstery from Henderson's car. It also obtained the victim's underwear. Spermatozoa from at least two males was identified on all of the pieces of upholstery. Henderson, however, could not be positively identified as the source of any of the spermatozoa -- indeed, he was excluded as a possible match from the three sperm samples. He was also excluded as a contributor from one of the other three DNA samples. No DNA from the victim was found anywhere in the car, despite her testimony that she had been struggling with her attacker on both the front and back seats. The state also introduced evidence that the digital penetration left behind particles of Y chromosome DNA in the victim's underwear. The analyst could neither identify nor eliminate Henderson as a contributor to this DNA.

¶7         After digitally penetrating the victim, the attacker ordered her back into the front seat of the vehicle to perform oral sex on him. When the attacker moved to get into the front seat, the victim escaped and the attacker immediately drove away. The victim observed the license plate number and called 911 moments later. The vehicle matching that license plate number belonged to Henderson's mother, which led police to Henderson.

¶8         When shown pictures of Henderson's vehicle at trial, the victim testified she did not recognize it. Another witness who saw the victim exit the vehicle in which the incidents occurred also testified that the pictures of Henderson's vehicle did not depict the vehicle she saw. The victim told the police her attacker drove a Range Rover but testified at trial her attacker's car was a "brownish" Chevrolet Tahoe. Henderson's mother's car -- the car matching the license number -- was neither a Range Rover nor a brownish Tahoe, but a greenish Hyundai crossover vehicle.

¶9             When the victim was initially shown a photographic lineup, she immediately identified Henderson as her assailant and said that on a scale of one to ten, her degree of certainty was a ten. At the first victim's trial, the second victim also identified Henderson in the courtroom. Before she testified, however, the prosecutor brought her into the courtroom during a break in the proceedings, when the judge and Henderson's attorney were absent but Henderson was present, and asked the second victim if she recognized anyone in the courtroom. She answered "No." The prosecutor then asked her if Henderson looked familiar to her, and she again answered "No." The prosecutor then said, "Just do your best." When asked about this incident in the second trial, the second victim claimed she could have identified Henderson, but did not because she did not want to look at him. Henderson and another witness testified that the victim had looked directly at Henderson several times during the encounter at the first trial.

¶10            There were significant discrepancies between the victim's descriptions of her attacker and Henderson's actual appearance. The victim testified that her attacker had multiple tattoos on both forearms in black ink. Henderson showed his arms to the jury: he had only one tattoo on his arm and it was in blue ink. When asked if there was any way she could be mistaken about her attacker's tattoos, the victim said "No." There were also discrepancies between her description of her attacker's hair and eye colors, which did not match Henderson's hair and eye colors.

¶11            At the first trial, the victim testified consistently throughout direct examination that she remembered almost nothing about the incident. She testified that she could not remember how or why she got into the car, she did not remember how her attacker was dressed, and in fact, didn't "remember much of this at all." However, at the second trial, the victim testified in detail as to exactly what happened on the day of the incident, and that her attacker was wearing a brown shirt and plaid shorts. A detective claimed to have found clothing in Henderson's residence that matched the clothing the victim described, yet the state never had the victim identify any of that clothing during her testimony.

¶12            There was evidence both to support and to call into doubt Henderson's alibi defense. Henderson claimed he was at work at the time of the incident. The first group of documents obtained from Henderson's employer did not contain any records that showed he had worked on the date of the incident. However, Henderson introduced a second set of documents from his employer indicating he was at work on the date of the incident. This second group of documents came to light only after Henderson and his mother were overheard discussing the need to create an alibi in recorded telephone conversations while he was in jail. These same conversations also included discussions regarding their need to wait and learn the date and time of the incident before they created the

alibi. Henderson's manager, a convicted felon, testified that if Henderson was on the "sales sheet" for the date of the incident, he worked that day for his full shift of 10:00 a.m. to 2:45 p.m. and did not leave early. Even so, neither Henderson's manager nor another employee who worked that day had any independent recollection of Henderson working on the date of the incident.

¶13 Ultimately, the jury convicted Henderson of two counts of sexual assault and acquitted him of sexual abuse, attempted sexual assault, and kidnapping. Henderson now appeals.

## DISCUSSION

### I. PRIOR-ACT EVIDENCE

¶14 Evidence of prior acts is inadmissible to prove the character of a person and action in conformity therewith, but it may be admissible if relevant and admitted for another purpose, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *State v. Van Adams*, 194 Ariz. 408, 415, ¶ 20, 984 P.2d 16, 23 (1999). To prove Henderson's identity as the attacker, the state introduced evidence that (A) on one occasion, Henderson had previously engaged the services of a prostitute, and (B) that Henderson had an interest in anal sex. The trial court's admission of this evidence violated Ariz. R. Evid. 404(b).

### A. Evidence of Previous Interaction with a Prostitute

¶15 Because Henderson moved to preclude evidence that he had previously engaged the services of a prostitute, we review the trial court's admission of that evidence for abuse of discretion. *Van Adams*, 194 Ariz.at 415, ¶ 20, 984 P.2d at 23.

¶16 "The identity exception to Ariz. R. Evid. 404(b) applies if identity is in issue, 'and if the behavior of the accused both on the occasion charged and on some other occasion is sufficiently distinctive, then proof that the accused was involved on the other occasion tends to prove his involvement in the crime charged.'" *State v. Stuard*, 176 Ariz. 589, 597, 863 P.2d 881, 889 (1993) (citation omitted). That the prior act and the charged offense are of "the same nature" is not sufficient. *Id.* To admit evidence of another act to prove identity, the "pattern and characteristics" of the prior act and the charged offense "*must be so unusual and distinctive as to be like a signature.*" *Id.* (emphasis added) (quotation omitted).

¶17 Here, the prior act is only similar to the charged offenses to the extent they each involve sexual conduct, and are far from distinctive. The evidence showed merely that Henderson engaged the services of a prostitute one time more

than a year before the incident -- nothing more.  There was no evidence to suggest that Henderson's prior engagement with a prostitute was in any way similar to the circumstances of the charged offenses.  Further, there was nothing about this reported encounter to suggest Henderson had come to know from it how to prove to a prostitute that he was not a police officer.[2]  It did not demonstrate a "pattern and characteristic" that was "so similar, unusual, and distinctive" that one could reasonably find they "bear the same signature" as the charged offenses.  The evidence the court admitted, therefore, does not fall within the scope of the identity exception to Rule 404(b) --in fact it exemplifies the type of character evidence that the Rules of Evidence prohibit.

¶18        The trial court erred when it allowed the state to introduce evidence of Henderson's previous interaction with a prostitute to prove his identity as the attacker.  We conclude that the error was not harmless.  "[E]vidence of [a] crime[ ] other than th[at] for which [a] defendant is being tried is not admissible because of the questionable relevancy of the evidence and prejudice to [the] defendant."  *State v. Eisenlord*, 137 Ariz. 385, 394-95, 670 P.2d 1209, 1218-19 (App. 1983).  The state argues that any error committed was not prejudicial because the court gave a limiting instruction and "there was overwhelming evidence of [Henderson's] guilt on the remaining charges."  We disagree.  Evidence of Henderson's guilt was legally sufficient, but conflicting.  And the fact that the jury acquitted Henderson of several charges belies the notion that the evidence was overwhelming.

        B.        Evidence of Henderson's Alleged Interest in Anal Sex

¶19        At trial, the following exchange took place:

THE STATE:  I want to put one additional thing on record.  I want to put the defense on notice that I will be going after him as to his interest in anal sex to which he did testify to in his last trial.  That he does have an interest in it, although it's not a fetish, in his own words, which goes to identity.

THE COURT:  For identity purposes only. . . .

¶20        Ariz. R. Evid. 404(c) allows the introduction of evidence of "aberrant sexual propensity" in certain cases upon the entry of specific predicate findings by

---

[2]        If, in fact, the method asserted is that by which parties to prostitution confirm they are not law enforcement, then anyone having ever engaged a prostitute, or anyone that had ever discussed the issue with someone who had previously engaged a prostitute, could have, potentially, come to understand that to be the case, and the act would not be unique to Henderson.

the trial court. No such findings were made here, and the state did not attempt to invoke Rule 404(c).

**¶21**        Instead, it appears that the court treated the proffered evidence as suitable for proof of identity under Rule 404(b). This was error. A defendant's generic sexual preferences generally are not "other crimes, wrongs, or acts" for purposes of Rule 404(b). *See State v. Featherman*, 133 Ariz. 340, 344, 651 P.2d 868, 872 (App. 1982) ("Evidence that the defendant has committed certain bad acts . . . is generally inadmissible . . . . However, the relevance of a prior bad act may outweigh the prejudice to the defendant 'if the illegal conduct does more than discredit the character of the defendant.'") (citation omitted). And here, the evidence that Henderson may have had a general, as yet unrealized but inchoate, curiosity about anal sex did not show anything "so unusual and distinctive" as to constitute a "signature." *Stuard*, 176 Ariz. at 597, 863 P.2d at 889.

**¶22**        Because Henderson did not object to the admission of evidence that he had an interest in anal sex for identity purposes, we review the court's decision for fundamental error. *See State v. Gendron*, 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991). Fundamental error is "'error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial.'" *State v. Garcia*, 220 Ariz. 49, 50, ¶ 2, 202 P.3d 514, 515 (App. 2008) (citation omitted). We conclude that the admission of the evidence was error, though it did not rise to the level of fundamental error. We therefore do not reverse on this ground, but we have addressed the issue to provide guidance on remand.

II.      THE DNA EVIDENCE ON RETRIAL

**¶23**        The state introduced evidence regarding a sample of DNA found in the victim's underwear that a crime lab analyst testified "matched" that of Henderson -- at least to the extent that she was not able to exclude Henderson as the source. The DNA analyst testified that the Phoenix crime lab tests two different types of DNA: (1) autosomal testing, which tests 16 different locations that men and women both share; and (2) Y chromosome testing, which tests 17 different locations that are only found in men, using each individual's Y-STR profile. She testified that there were non-sperm and sperm samples of DNA found in the victim's underwear. The autosomal test results from the victim's underwear came back "matching" only the DNA profiles of the victim and her boyfriend, the two having engaged in sex on the day of the attack. The Y chromosomal non-sperm testing revealed that portions of the samples purportedly "matched" Henderson's profile, and portions "matched" the victim's boyfriend, meaning Y chromosome DNA identifiers for each were found in the victim's underwear. However, using the "counting method," which simply tabulates how many times

a particular DNA profile has been seen in a national DNA database, the analyst testified that Henderson's "particular profile" would be expected to also be seen in approximately one in every 530 Hispanic males, one in every 640 African-American males, and one in every 1300 Caucasian males. Meaning, "if we had a room with 530 Hispanic males, the chances are that I would be able to find one [person] that I would not be able to exclude from that mixture."

¶24 The term "match," when used in conjunction with such DNA evidence, is potentially misleading, because it refers only to the congruity between the points at which the test is made. Because the "match" does not refer to a person's entire genome, it is possible to misunderstand the term as a dispositive finding that a specific person's DNA was found at the scene, rather than a conclusion with only statistical import.

¶25 Here, the statistical significance of the DNA findings was such that a great number of individuals in the general area of the attack could have been contributors. But as our supreme court observed in *State v. Forde*, 233 Ariz. 543, 561, ¶ 64, 315 P.3d 1200, 1218 (2014), even DNA results with such limited statistical certainty "increase[ ] the probability" that the defendant was present. Such evidence is therefore relevant. And even DNA evidence with relatively low statistical significance may be admitted under Rules 702 and 403, "provided that certain safeguards are afforded." *United States v. Morrow*, 374 F. Supp. 2d 51, 63, 68 (D.D.C. 2005) ("[T]he best practice is to include statistical data on the frequency of the matching characteristics in the relevant reference population when admitting DNA evidence.").

¶26 Because the DNA evidence introduced in this case satisfies the minimal standards of *Forde*, we do not reverse on this basis. We note, however, that the court should be vigilant -- especially in cases in which the statistical probity of DNA evidence is low -- to ensure that the jury is afforded a full opportunity to learn the scientific meaning of casual terms such as "match" in this context.

III. SUFFICIENCY OF THE EVIDENCE

¶27 Henderson argues the trial court should have reversed his convictions based upon insufficiency of the evidence. He also argues the guilty verdicts were contrary to the weight of the evidence and, therefore, the trial court should have granted his motion for new trial pursuant to Ariz. R. Crim. P. 24.1(c)(1). We address these arguments despite our reversal of Henderson's convictions because the charges would have to be dismissed if the evidence at trial were insufficient to support the verdict. *See State v. Fulminante*, 193 Ariz. 485, 492, ¶ 19, 975 P.2d 75, 82 (1999).

¶28 "Reversible error based upon insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction." *State v. Soto-Fong*, 187 Ariz. 186, 200, 928 P.2d 610, 624 (1996) (citation omitted). The case must be submitted to the jury if reasonable minds can differ on inferences to be drawn from the evidence introduced at trial. *State v. Hickle*, 129 Ariz. 330, 331, 631 P.2d 112, 113 (1981). And "[b]ecause a jury is free to credit or discredit testimony, we cannot guess what they believed, nor can we determine what a reasonable jury should have believed." *State v. Bass*, 198 Ariz. 571, 582, ¶ 46, 12 P.2d 796, 807 (2000). The evidence here was sufficient to permit a reasonable jury to find beyond a reasonable doubt that Henderson committed both counts of sexual assault.

¶29 Regarding the motion for new trial, "[m]otions for new trial are disfavored and should be granted with great caution." *State v. Rankovich*, 159 Ariz. 116, 121, 756 P.2d 518, 523 (1988). We review denial of a motion for new trial for abuse of discretion. *Id.* On this record, the court could properly have exercised its discretion to grant the motion, but we cannot find that it abused its discretion by failing to do so. [3]

## CONCLUSION

¶30 We reverse Henderson's convictions and sentences for sexual assault and remand for proceedings consistent with this decision.



Ruth A. Willingham · Clerk of the Court
F I L E D : jt

---

[3] We need not address the other issues Henderson raises on appeal in light of our reversal of his case. In further regard to the issues Henderson first presented in his reply brief, we do not consider arguments or issues first raised in a reply brief. *See State v. Watson*, 198 Ariz. 48, 51, ¶ 4, 6 P.3d 752, 755 (App. 2000).